Alyson A. Foster (ISB No. 9719)
alyson@dempseyfoster.com
Jennifer Schrack Dempsey (ISB No. 7603)
jen@dempseyfoster.com
DEMPSEY FOSTER PLLC
800 W. Main Street, Suite 1460
Boise, Idaho 83702
(208) 401-9533

*Attorneys for Plaintiff Alper Guler*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALPER GULER, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>CRYPTO TRADERS MANAGEMENT, LLC, an Idaho limited liability company; SHAWN CUTTING, individually and as trustee of the Lake View Trust; COURTNEY LATA, an individual; JANINE CUTTING, individually and as trustee of the Lake View Trust; ASH DEVELOPMENT, LLC, an Idaho limited liability company; GOLDEN CROSS INVESTMENTS, LLC, an Idaho limited liability company; CRYPTO TRADERS FUND, LP, a Delaware limited partnership; the LAKE VIEW TRUST; and DOES 1-20,<br><br>    Defendants. | Case No. 2:21-cv-00116<br><br>**VERIFIED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Alper Guler ("**Guler**"), by and through his attorneys, Dempsey Foster PLLC, for his Verified Complaint against Defendants, alleges, on knowledge as to his own actions, and otherwise upon information and belief, as follows:

VERIFIED COMPLAINT                                                                                1

## PRELIMINARY STATEMENT

1.     This is a suit by an investor in a cryptocurrency investment fund against the fund and its managers for defrauding investors. Defendants conned Guler into depositing money by assuring him his investment would grow in value and could be withdrawn at any time when in fact investments were simply being stolen or lost.

2.     Guler seeks $201,000 in damages for the amount he invested; the amount of money he would have earned in the crypto market if Defendants had returned his altcoins and investment when he demanded them, which amount upon information and belief exceeds $1 million; a return of the altcoins purchased with his investments; a set-aside of all fraudulent transfers of assets or money made by Defendants to hinder Guler as a creditor; and prejudgment and post-judgment interest accruing at the statutory rates.

## JURISDICTION

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is an action rising under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "**Exchange Act**"). Subject-matter jurisdiction under the Exchange Act is further founded under 15 U.S.C. § 78aa(a).

4.     This Court has jurisdiction over all state law claims in this action pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the suit is between Plaintiff, who is a citizen of Florida and Norway, and Defendants, who are citizens of Idaho.

## VENUE

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in, or are principally located in, the state of Idaho and because a substantial part of the events or omissions giving rise to the claim occurred in this state.

7.      Venue is also proper pursuant to the Exchange Act, 15 U.S.C. § 78aa(a), because all Defendants reside in and transact or transacted business in this district.

## PARTIES

### I.      **Plaintiff**

8.      Guler is an individual who resides primarily in Parkland, Florida, and sometimes in his home country of Norway.

### II.      **Defendants**

9.      Defendant Crypto Traders Management, LLC ("**CTM**") is a limited liability company formed under the laws of Idaho, formerly with a principal place of business located in Bonner County, Idaho. CTM was administratively dissolved effective May 15, 2019, and has not been reinstated. On information and belief, it is believed that Defendant Shawn Cutting was the sole member/manager of CTM. CTM is not, and never has been, a registered broker-dealer under state or federal law.

10.      Defendant Shawn Cutting ("**Cutting**") is an individual who resides in Blanchard, Bonner County, Idaho. Cutting is not, and never has been, a registered broker-dealer under state or federal law. Cutting has a history of multiple convictions for theft, bank fraud, and forgery going back at least to the 1990s.

11.      Defendant Courtney Lata ("**Lata**") is an individual who resides in Coeur d'Alene, Kootenai County, Idaho. Lata is Cutting's daughter and is formerly known as Courtney Cutting. Lata is not, and never has been, a registered broker-dealer under state or federal law.

12.     Defendants Cutting and Lata, in conducting the investment enterprise described herein, have referred to themselves as "**CTM**" or "**CTC**" and here are referred to as the **CTM Defendants**.

13.     Defendant Janine Cutting ("**Janine**") is an individual who resides in Blanchard, Bonner County, Idaho. Janine is Cutting's wife and Lata's mother. Cutting is not, and never has been, a registered broker-dealer under state or federal law.

14.     Defendant Ash Development, LLC ("**Ash Development**") is a limited liability company formed under the laws of Idaho, with a principal place of business in Kootenai County, Idaho. On information and belief, Lata is the is the sole member and manager of Ash Development.

15.     Defendant Golden Cross Investments, LLC ("**Golden Cross**") is a limited liability company formed under the laws of Idaho, formerly with a principal place of business located in Bonner County, Idaho. Golden Cross was administratively dissolved effective May 7, 2020 and has not been reinstated. On information and belief, Cutting and Janine are the only members of Golden Cross.

16.     Defendant Crypto Traders Fund, LP ("**CTF**") is a limited partnership, formed under the laws of Delaware. On information and belief, CTM is the general partner of CTF.

17.     Defendant Lake View Trust ("**Lake View Trust**") was formed in and under the Economic Strategist Irrevocable Spendthrift Trust Agreement, dated February 4, 2018. Cutting and Janine are co-trustees of the Lake View Trust. Cutting and Janine are named as defendants herein individually and as co-trustees of the Lake View Trust.

### III.   **Doe Defendants**

18.     The fictitiously named Doe Defendants in the caption to the Complaint are individuals and entities which, on information and belief, have committed acts or omissions, or have caused events to occur, that have resulted in damages to Guler. If and when the identities of those individuals and entities are discovered, this Complaint shall be amended accordingly.

### IV.   **Alter Ego Allegations**

19.     At all relevant times, and upon information and belief, Defendants were the alter egos of each other, and there exists, and has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist in that Cutting, Janine, and Lata completely controlled, dominated, managed, and operated the corporate entity defendants to suit their convenience.

20.     Specifically, at all relevant times, on information and belief, Cutting, Janine, and Lata (1) controlled the business, management, policies and affairs of CTM, Ash Development, Golden Cross, CTF, and the Lake View Trust; (2) commingled the funds and assets of these corporate entities and diverted corporate funds and assets for their own personal use; (3) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (4) inadequately capitalized CTM and CTF; (5) used the same office or business location and employed the same employees for the corporate entities; (6) used the corporate entities as mere shells, instrumentalities or conduits for themselves and/or their individual businesses; (7) used the corporate entities to procure labor, services or merchandise for another person or entities; (8) manipulated the assets and liabilities between the corporate entities so as to concentrate the assets in one and the liabilities in another; (9) used corporate

entities to conceal their ownership, management and financial interests and/or personal business activities; and/or (10) used the corporate entities to shield against personal obligations.

21.    At all relevant times, these corporate entities were not only influenced and governed by Cutting, Janine, and Lata, but there was also such a unity of interests and ownership that the individuality, or separateness of all Defendants has ceased, and the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

## V.    Agency; Aiding and Abetting; and Conspiracy Allegations

22.    At all times relevant to this Complaint, Defendants, and each of them, were acting as the agents, employees, and/or representatives of each other, and were acting within the course and scope of their agency and employment with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

23.    As members of the conspiracies alleged more fully below, each of the Defendants participated and acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and have performed acts and made statements in furtherance of the conspiracy and other violations of law.

24.    Each Defendant acted both individually and in alignment with the other Defendants with full knowledge of their respective wrongful conduct. As such, Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts outlined in this Complaint.

25.    Defendants are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from

the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## FACTS

### I.   Cutting Creates an Altcoin Investment Scam

26.     In recent years, popular interest in digital assets has skyrocketed worldwide. Often called "cryptocurrencies," there are now numerous digital assets based on blockchain technology, which allows asset owners to hold and transfer assets without the need for a centralized processing authority.

27.     Perhaps the best-known digital asset is Bitcoin. However, there are now more than 5,000 alternative blockchain-based assets generally known as "**altcoins**." It is common for altcoin issuers to begin sales of altcoins in "**initial coin offerings**" or "**ICOs**" in a process that resembles an informal initial public offering of unregistered securities. More recently, altcoin offerings called "**initial exchange offerings**" or "**IEOs**" have moved to online trading platforms purporting to be legitimate securities exchanges engaging in offerings for companies raising capital. Collectively, ICOs and IEOs are referred to as "**altcoin offerings**."

28.     The U.S. Securities and Exchange Commission ("**SEC**") has noted that altcoin offerings are frequently conducted in violation of applicable securities regulations and on exchanges not properly registered with (or exempt from registration with) the SEC.[1] In the past

---

[1] *See, e.g.*, *Statement on Potentially Unlawful Online Platforms for Trading Digital Assets*, U.S. Securities & Exchange Commission (Mar. 7, 2018) https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading; *Statement on Cryptocurrencies and Initial Coin Offerings*, U.S. Securities & Exchange Commission (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11; *Investor Bulletin: Initial Coin Offerings*, U.S. Securities & Exchange Commission (July 25, 2017) https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings; *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, U.S. Securities & Exchange Commission (May 7, 2014), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39.

VERIFIED COMPLAINT                                                                                        7

several years, the SEC has aggressively ramped up enforcement activity against illegal altcoin offerings.

29.     Altcoin offerings have frequently proven merely to be a new take on old "pump-and-dump" investment scams or simply offerings of valueless and fraudulent securities. In addition, a cottage industry has grown up around altcoin offerings to pursue other kinds of fraud, such as soliciting bogus investment fees from investors or conducting old-fashioned Ponzi schemes dressed up as novel, "cutting-edge" investment opportunities.[2]

30.     Sometime in or around 2017, Cutting began running a scheme under which he took "deposits" from the public for a fund that supposedly invested in altcoin offerings (the "**Crypto Fund**").

31.     The Crypto Fund was a scam to induce investors to hand over ever increasing amounts of money by fraudulently stating that investments were growing rapidly and could be withdrawn on request when in fact the money was either being squandered or stolen and could not be withdrawn.

32.     The Crypto Fund was not Cutting's first scam. In 2001, Cutting was charged with Fraud on a Financial Institution. He entered a plea agreement and was sentenced to 6 months in prison. According to the charging documents filed in the matter, Cutting had "devised a scheme to defraud Key Bank of Idaho and Zions Bank and to obtain moneys. . . or other property owned by or under the custody or control of said financial institutions by means of false or fraudulent pretenses." In 2008 Cutting was charged with five counts of Theft by False Promise and three counts of Fraud for Possession of a Financial Transaction Card ("**FTC**"), FTC Number, and FTC

_____

[2] *See Investor Alert: Ponzi Schemes Using Virtual Currencies*, S.E.C. Office of Investor Education and Advocacy (July 23, 2013), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-7

Forgery Device. He pleaded guilty to one count of fraud for Possession of a FTC, FTC Number, and FTC Forgery Device and was sentenced to 30 days in jail.

## II.    The CTM Defendants Induce Guler to Invest His Life's Savings in the Crypto Fund

33.    Guler is a personal trainer and nutritionist. He is not a professional investor or expert in financial investing or markets. He has not received any formal training or education in financial markets or investment. His education was focused on personal training and nutrition and that has been his career for many years.

34.    In 2017, Guler became aware that investing in altcoins was a new type of investment that could be very profitable. He decided to learn more about cryptocurrencies and how to invest in the market.

35.    In spring 2017, Guler traveled to a cryptocurrency conference in Las Vegas, Nevada to learn about the cryptocurrency market and to seek an expert he could work with. He met Cutting at this conference.

36.    Cutting was friendly and charming. Cutting told Guler he was a professional financial advisor who was an expert in the cryptocurrency market and had a company for cryptocurrency investment. Guler checked Cutting's Facebook profile, where Cutting held himself out as a financial advisor and expert in the cryptocurrency market.

37.    Cutting told Guler many things that made Guler believe he was an expert who could be trusted. For example, Cutting told him that new cryptocurrency products would be available in a formal market exchange and would therefore be strong investments. Cutting told him that, by investing in a formal market exchange, the investment would be a "real" one and would make a lot of money. Cutting introduced Guler to other people at the conference who said they had invested with Cutting and made a profit doing so.

38.    Cutting specifically told Guler that, because of his experience and qualifications,

he knows what is a scam and what is not a scam, and that he can help Guler and others be able to spot a scam and avoid investing in it. Cutting told Guler that if Guler knows people who had lost money in a scam, he should introduce them to Cutting so that Cutting could help them recover their losses and help them continue to invest in a "non-scam" fund.

39.     Cutting came across as a calm, nice person with expertise in the market whom Guler could trust. Cutting even invited Guler to visit his family home to get to know him and his family better. Guler traveled to Idaho in summer 2018 and visited Cutting's family. They treated him nicely and made him feel "part of the family."

40.     At no point did the CTM Defendants take any steps to confirm Guler's identity or his status as an accredited or sophisticated investor.

41.     Guler did not know that Cutting had previously been convicted of fraud and served time in jail.

42.     For the next two years, the CTM Defendants cultivated a relationship with Guler based on charm and manipulation. Cutting repeatedly told Guler he was "part of the family" and that they would "take care of him."

43.     On or about December 1, 2017, and December 11, 2017, Guler directed his friend, Rosetta Corteo, to wire $80,000.00 and $100,000.00, respectively, on Guler's behalf to an account that Cutting had instructed him to wire the funds to. The account was held at Inland Northwest Bank (which was acquired by First Interstate Bank in 2018) in the names of Shawn Cutting and Janine Cutting.

44.     Before Guler made his investment, the CTM Defendants made no cautionary disclosures to Guler or provided him with a prospectus, a subscription agreement, or the like. Guler was never asked to execute, and never executed, any written agreement with any

VERIFIED COMPLAINT                                                                                  10

Defendant.

45.     Through text messages, Cutting confirmed receipt of $180,000.00. On December 1, 2017, Cutting confirmed receipt of the wire transfer of $80,000.00, stating "Hey buddy…we received your 80k bank wire. I will get it to work right away. Have a great day!!!" On December 11, 2017, Cutting confirmed via text that they had received the wire transfer of $100,000.00, stating "Hello buddy, hope all is well. We did receive your 100k, it just won't hard post until midnight, so all is well. We will get it right to work. Have a great day and talk soon!!!!!."

### III.     The CTM Defendants Constantly Communicated with Guler that His Investment was Growing

46.     After making his investment, Guler began receiving email "newsletters" and a single "earnings update" from Cutting/CTC. Although Cutting signed the newsletters and earnings update emails as the "CTC Team" or "CTM Team," the CTC or CTM team consisted solely of Cutting and Lata. These newsletters and updates caused Guler to believe that not only would his investment gains be expressed in U.S. Dollars but also that he was earning significant dividends on his investment.

47.     On January 13, 2018, the CTM Defendants provided Guler with a newsletter which said "[e]ven though it was another bearish week for the alts, we still pulled an 11% Gain that has been added to everyone's portfolio."

48.     On January 19, 2018, the CTM Defendants provided Guler with another newsletter, which said that, despite the massive market correction where "approximately $300 million exited the market… We have experienced 0% in gains this week, which is great news because most people lost half of their portfolio due to panic selling." The CTM Defendants further claimed that "we were able to proactively close out of multiple positions prior to this week's major market conditions and opened many new positions at new lower entry prices that

will help us to see strong gains in the weeks ahead." The CTM Defendants then put a temporary hold on withdrawals, claiming that such a position was "in the best interest for everyone."

49.    On January 28, 2018, the CTM Defendants provided another newsletter stating that, despite continued market correction and losses, "we did not lose a penny and we are set up for better gains in weeks and months to come." The CTM Defendants then encouraged Guler to buy "as many alt-coins as physically possible." The CTM Defendants assured Guler by representing that "What's cool, is that no matter what the market is doing, we still win."

50.    On February 21, 2018, the CTM Defendants sent Guler another newsletter, advising that withdrawals would now be limited to once a month and that the frequency of trade updates would be monthly instead of weekly.

51.    On March 5, 2018, Cutting provided Guler a CTC Earnings Update for February 2018, that purportedly reflected information about Guler's investments of $80,000.00 and $100,000.00. That February 2018 Earnings Update provided as follows:



52.     This statement reflected that, between January 1, 2018 and January 31, 2018, a withdrawal of $177,000 was made from Guler's account. Guler was confused because he had made no such withdrawal. Guler asked Cutting what this was and Cutting explained that he had transferred the investment to the "family" account, that Guler was now "part of the family," and that they would "take care of [Guler]." Guler was pleased with this level of care and treatment.

53.     Thus, overall, this account statement reflected that the value of Guler's investment as of February 28, 2018, was $233,200.00:

| | |
|---|---|
| Deposits | $80,000.00 |
| | $100,000.00 |
| Earnings | $53,200.00 |
| | ($12,212.26) |
| **TOTAL** | **$233,200.00** |

54.     On March 25, 2018, the CTM Defendants sent Guler a newsletter claiming that, "without a doubt.. hanging in there is by far everyone's best bet to see amazing gains throughout the year." The CTM Defendants further assured Guler that "what we do is real and true long-term investing/trading and not a month to month investing program."

55.     On April 27, 2018, the CTM Defendants sent Guler another newsletter, which claimed "[w]e have been making great gains this past couple of weeks and we will be back to the green real soon."

56.     On May 5, 2018, the CTM Defendants sent Guler yet another newsletter claiming that, even though the "1st 20 days were a little rough," "we still pulled an 18% gain for the month of April." Even though the CTM Defendants and Janine accepted Guler's investment in December 2017, in this newsletter, the CTM Defendants claimed that "we had to put a temporary hold on deposits to get caught up."

57.     By May 29, 2018, the CTM Defendants convinced Guler to invest additional money. Guler had already invested his life's savings. He therefore invested again by transferring the only other cryptocurrency investment he had ever made—one he had made himself in the open market prior to meeting Cutting—that consisted of altcoins valued at $25,000. Cutting instructed Guler to wire the investment to an account in Lata's name at Mountain West Bank and told him: "Please don't use the word crypto currency in the memo, ha." Guler made the transfer as instructed. This brought the total amount Guler had invested in the Crypto Fund to $205,000.

58.     On June 28, 2018, the CTM Defendants sent Guler a newsletter that said

"[t]here's absolutely no reason to ever sell while in the red." The CTM Defendants assured Guler
that "[a]ll of the Alts that we are holding, are set to make massive gains and we will be right here
to take the profits." After criticizing other altcoin platforms, the CTM Defendants stated "we are
fully licensed, have attorneys who look out for us and our clients best interest, Admin teams to
make sure we are doing our job correctly. Auditing Teams who make sure the Admins are doing
their jobs correctly and CPA's to make sure that Auditors are doing their jobs correctly."

59.     On July 27, 2018, Cutting sent Guler a text stating that "[t]he markets are on our
side this past couple days and giving us a chance buy even lower….perfect timing. I will make
sure that I am available all day for your messages or call, so that we can get this party started."

60.     On August 13, 2018, the CTM Defendants sent Guler a newsletter that said, "It's
been a crazy year with an early and extended correction" and "[w]hen Alts go up…we make
money, when Alts go down…we buy for max gains in the future, a win/win." They further said,
"right now is for sure the best time to be buying/adding to your portfolio for amazing gains due
to the current dips in the markets and absolutely the worst time to be doing withdrawals, because
this is the time that we have been waiting and holding for." The CTM Defendants represented
that they "had a 28% gain." In this email, the CTM Defendants also provided a "cool deposit and
withdrawal link to make it easier for everyone," i.e., Guler and other investors, to make
investments and withdrawals from the Crypto Fund online.

61.     On August 14, 2018, utilizing the form the CTM Defendants had directed
investors to use, Guler requested a withdrawal of $4,000. Guler also sent a text to Cutting, telling
Cutting that he was running out of money and needed some quick cash. Cutting told Guler he
"will absolutely take care if (*sic*) of you. You didn't have to fill out the withdrawal form, cause
you are a family buddy."

62.     Cutting then transferred $4,000 to Guler.

**IV.     Defendants Refuse to Return Guler's Investment and Altcoins Upon Request**

63.     At the end of 2018, Guler wanted to withdraw his investment from CTM to purchase a new home. Cutting had previously told Guler he did not need to fill out a formal withdrawal application and instead should just contact Cutting directly. Guler therefore texted and called Cutting and requested to withdraw the investment. Cutting responded that the market was down and that Guler should not withdraw until the market went up.

64.     Guler responded that even if the coins were valued less than the initial investment of ~$200K, he wanted the actual coins returned, or at least their current value even if that was less than the initial ~$200K. Cutting responded that this would be difficult to do quickly because Guler's investment was pooled with others', but that he would find the money for the coins' value from another source.

65.     Guler traveled to Idaho in March 2019 to meet with Cutting about the status of his investment. Guler stayed at Cutting's house with his family for two days. Cutting asked him when he needed his money back and Guler responded "immediately." Cutting agreed and promised to send Guler the money within one week once Guler sent him his banking information.

66.     As requested, on March 17, 2019, Guler sent Cutting his bank and account information. That same day, Cutting confirmed he had received Guler's account information and that he had "been working on how to fund what you need."

67.     Two days later, Guler texted Cutting again, asking if Cutting had the money. Three days later, Cutting said he was "struggling a little finding funds" but that he was "handling it ASAP." Cutting explained that, right after Guler left Idaho, they began having problems with their house and had to sell it and therefore were not able to return Guler's investment to him yet.

VERIFIED COMPLAINT                                                                                      16

68.     Over the course of the following year, Guler texted Cutting on numerous occasions, sometimes several times a month, requesting Cutting return his investment funds. When Cutting would finally respond after days of ignoring Guler's multiple texts, Cutting would string Guler along, asserting excuses that ran from vacationing with his family to COVID. He would tell Guler that his internet was down and he was having technical difficulties, even though Guler had observed when visiting Cutting in 2018 that Cutting's house had multiple computers and systems to run the business. While Cutting always had some excuse as to why it was taking so long to return Guler's investment, in each communication, Cutting represented that he was working to return Guler's investment.

69.     Desperate, on April 5, 2020, Guler texted Cutting "Hey buddy, hope you're doing well. Seriously We have to talk today, I have to know what to do and make a choice of what direction to take of my life, I can not stay here any longer, my life is depending on you now And I don't know what your intentions are, so we have to come to a clarity on what to do!!" Cutter responded that he "cannot make any promise to you on anything because nothing seams (*sic*) to go my way and I never know what is going to happen……as things change daily."

70.     On April 6, 2020, Cutting agreed to a call with Guler but, when Guler tried to reach Cutting through multiple texts and voicemails, Cutting never responded.

71.     In June 2020, other investors filed a lawsuit against Cutting alleging securities fraud and other violations of state and federal law based on Defendants' theft of their cryptocurrency investments. *See Powell v. Crypto Traders Management, LLC, et al.*, No. 2:20-cv-00352-BLW (D. Idaho).

72.     Alarmed by this, Guler urgently demanded that Cutting return his investment. In response, Cutting informed Guler for the first time that Guler had *nothing* in his account because

he had withdrawn all funds in *January 2018*. Cutting accused Guler of trying to take advantage

of Cutting and threatened to "ruin his credibility":

> Are you denying that we paid you $138k in January 23rd, 2018? That's just
> one of the withdrawals that we paid you. I have them all and we will prove
> it. Seriously Alper . . . . are you kidding me? You out in 180k and
> withdrew over $242k. Our it guys can prove that we sent it to you and we
> have all of our texts and emails. Don't be that type of person who tries to
> take advantage of people in lousy situations, because we can prove it and
> then ruin your credibility.
>
>   . . .
>
> We, in no way frauded anyone . . . .

73.     Along with this text message, Cutting texted Guler a snapshot of a computer

screen that purported to show that a total of $242,602.85 had been withdrawn from the "Alper

Gurler (sic)" account and that his active investment was "$0.00":




74.     This statement was confusing and alarming. Guler had never withdrawn

$242,602.85—he had only withdrawn $4,000 in August 2018—and had understood and been

told that his active investment was growing. The CTM Defendants had communicated with

Guler about his investment throughout 2018 and 2019 and constantly told him his investment

was doing well. Cutting had told Guler on several occasions he was working to find the money to

return Guler's investment—not that his account had already been emptied. Indeed, Guler had

withdrawn $4,000 in August 2018, which he could not have done if he had in fact withdrawn his

entire account in January 2018. Moreover, this statement did not reflect the additional $25,000

worth of altcoins Guler had invested in May 2018, which should have made the "Deposited"

amount $205,000, not $180,000.

75.     Guler told Cutting he had never made this withdrawal. Cutting suggested that perhaps Guler had been "hacked." Guler did not understand this because Cutting had always told Guler that his investment had been put in the "family" investments, and Guler did not have control over that account. Guler asked Cutting to speak directly on the phone. Cutting refused.

76.     To date, Defendants have not returned Guler's money or the altcoins associated with his investment.

## V.     Unknown to Guler, the CTM Defendants and Janine Transferred Property To Hinder His Ability to Collect

77.     Upon information and belief, while they were taking investor money and promising withdrawals upon request, Cutting, Lata, and CTM (the "**Transferor Defendants**") began transferring assets—namely money—to Janine, Golden Cross, Ash Development, CTF, and the Lake View Trust (the "**Transferee Defendants**").

78.     Upon information and belief, the Transferee Defendants used the money to purchase real and personal property including, without limitation, the property described below.

79.     Upon information and belief, on May 20, 2019, Janine purchased property known as Lot 12, Block 1, Bing Haven Estates, Kootenai County, Idaho ("**Bing Haven Property**") for approximately $379,000. On the same day, Janine executed a Deed of Trust in the amount of $293,985 and, on information and belief, made a down payment of approximately $85,000.

80.     Upon information and belief, on May 20, 2019, Shawn Cutting executed a deed quitclaiming all of his interest in the Bing Haven Property to Janine.

81.     Upon information and belief, in August 2019, Cutting and Janine purchased the following vehicles which they titled to and registered in the name of the Lake View Trust:

> a.     2018 Jeep Grand Cherokee 4-Door Wagon, acquired and titled on August 19, 2019;

     b.      2018 Trailer, acquired and titled on August 19, 2019;

     c.      2017 Chevrolet Camaro, acquired and titled on August 19, 2019;

     d.      2013 Chrysler 300 4-Door Sedan, acquired and titled on August 19, 2019;

     e.      2012 Ford 350 Truck; acquired and titled on August 19, 2019;

     f.      2018 Polaris PRO RMK 800 Snowmobile, acquired and titled on August 20, 2019;

     g.      2017 Arctic Cat Bearcat 2000 LT ES Snowmobile (green), acquired and titled on August 20, 2019;

     h.      2017 Artic Cat Bearcat 2000 LT ES Snowmobile (black), acquired and titled on August 20, 2019;

     i.      2017 Polaris PRO RMK 800 Snowmobile (black), acquired and titled on August 20, 2019;

     j.      2017 Polaris PRO RMK 800 Snowmobile (red), acquired and titled on August 20, 2019;

     k.      2017 Polaris General 100 EPS Motorcycle, acquired and titled on August 20, 2019; and

     l.      2012 Volkswagen Jetta, acquired and titled on August 22, 2019.

82.     Upon information and belief, on August 2, 2019, Golden Cross purchased real property known as Lot 3, Hatley Tracts in Bonner County, Idaho ("**Hatley Tracts**") for approximately $81,250. On the same day, Golden Cross executed a Deed of Trust in the amount of $65,000 and, on information and belief, made a down payment of approximately $16,250. Cutting and Janine executed the Deed of Trust on Golden Cross's behalf.

83.     Upon information and belief, Golden Cross thereafter quitclaimed the Hatley Tracts property to the Lake View Trust on August 18, 2020. Janine and Cutting executed the quitclaim deed on Golden Cross's behalf. The Lake View Trust, in turn, sold the property to Christopher and Jennifer Green on August 21, 2020. Shawn executed the warranty deed as trustee.

84.     Upon information and belief, on September 24, 2019, the Lake View Trust purchased real property known as Lot 1A of the Replat of Lots 1 and 2 of Heavenly Hills in Bonner County, Idaho ("**Heavenly Hills Property**"). On information and belief, the Lake View Trust paid the full purchase price of $125,000 at the time of purchase.

85.     Upon information and belief, on May 28, 2020, CTF acquired and titled a 2018 Karavan Trailer.

86.     Lata formed Ash Development on or around May 11, 2020, after Guler and other investors had demanded return of their investments. Upon information and belief, on July 22, 2020, Ash Development purchased real property known as Lot 1, Creekridge Estates, Bonner County, Idaho for approximately $133,750 ("**Creekridge 1**"). On the same day, Ash Development executed a Deed of Trust in the amount of $107,000 and, on information and belief, made a down payment of approximately $26,750. Lata executed the Deed of Trust as Ash Development's managing member.

87.     Upon information and belief, on July 24, 2020, the Lake View Trust purchased Lot 2, Creekridge Estates, Bonner County, Idaho for approximately $102,500 ("**Creekridge 2**"). On the same day, the Lake View Trust executed a Deed of Trust in the amount of $82,000 and, on information and belief, made a down payment of approximately $20,500. Cutting and Janine Cutting both executed the Deed of Trust as trustees.

88.     Upon information and belief, on July 24, 2020, the Lake View Trust purchased Lot 7, Creekridge Estates, Bonner County, Idaho for approximately $156,250 ("**Creekridge 7**"). The Lake View Trust executed a Deed of Trust in the amount of $125,000 and, on information and belief, made a down payment of approximately $31,250. Cutting and Janine executed the Deed of Trust as trustees.

89.     At the time the Transferor Defendants transferred the assets to the Transferee

Defendants, Guler was (and still is) a creditor of the Transferor Defendants under Idaho's

Voidable Transfers Act, Idaho Code §§ 55-901 et seq.

90.     Upon information and belief, the Transferor Defendants transferred assets with an

actual intent to hinder, delay or defraud investor creditors such as Guler.

91.     Upon information and belief, the Transferee Defendants are not good-faith

transferees and did not exchange reasonably equivalent value for the transferred assets.

92.     Upon information and belief, the Transferee Defendants were "insiders" of the

Transferor Defendants as that term is defined in the Idaho Voidable Transfers Act, Idaho Code

§ 55-910(8). Janine is Cutting's wife and Lata's mother. The Lake View Trust, Golden Cross,

and CTF are legal entities operated by and with assets controlled by or substantially controlled

by Cutting. Ash Development is a legal entity operated by and with assets controlled or

substantially controlled by Lata.

93.     Upon information and belief, Lata, Janine, and Cutting maintained control over

the assets once they were transferred and have attempted to conceal the transfers.

94.     Upon information and belief, the transfers resulted in insolvency. The Transferor

Defendants have represented that they are financially unable to repay Guler in accordance with

the promises they made to induce Guler's investments. The Transferor Defendants also have

failed or refused to return investments from numerous others who invested in the Crypto Fund in

the same general timeframe as Guler.

## VI.     The SEC Is Currently Investigating Cutting and CTM for Fraud and Other Securities Violations

95.     On October 1, 2020, the SEC issued an Order Directing Private Investigation and

Designating Officers to Take Testimony in the Matter of Crypto Traders Management, LLC (D-

3957) ("**Formal Order**"). *See Verified Opposition of SEC to Motion to Quash*, *Crypto Traders Mgt. v. SEC*, No. 1:20-mc-00335-BLW (D. Idaho), Dec. 23, 2020, Dkt. 5 at 2.[3] The Formal Order states that the SEC has information tending to show that CTM, "its officers, directors, employees, partners, subsidiaries, and/or affiliates and/or other persons or entities" may have purchased, sold or offered for sale securities, including, but not limited to, ownership interests in a cryptocurrency fund, in violation of the antifraud, securities registration, and broker-dealer registration provisions of the securities laws (Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act, and Rule 10b-5 thereunder). *Id.* at 2-3. These provisions prohibit "persons and entities" from, among other things, using devices, schemes, or artifices to defraud; making untrue statements of material facts; and omitting to state material facts in connection with the purchase, sale or offer of securities to any person. *Id.* at 3. In light of this information, the Formal Order directs "that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object." *Id.*

96.     The SEC reports that, through its investigation, it has obtained evidence that Cutting and Lata "may have been running an illegal investment scheme in which they raised over $1.6 million from at least 300 investors." *Id.* Specifically: Individuals made payments to CTM, which Cutting owns and controls, for investment in a CTM fund that purportedly purchases and sells cryptocurrencies. *Id.* at 3-4. Investors received regular updates regarding their investments and monthly newsletters in which Cutting touted to investors the regular positive returns of the

---

[3] The SEC filed this verified opposition in *Crypto Traders Management, LLC, et al., v. United States Securities & Exchange Commission*, No. 1:20-mc-00335-BLW (D. Idaho) in opposition to CTM and Cutting's Motion to Quash a subpoena issued by the SEC to Glacier Bank seeking information about Cutting's bank accounts.

fund. *Id.* at 4. Cutting started the investment scheme in 2017 and began raising money from investors in 2018. *Id.*

97.    The SEC further reports having obtained evidence "which suggests that Cutting misappropriated much of the money invested with CTM. Cutting appears to have spent investor money to purchase real estate, vehicles, and other items. There is also evidence that Cutting withdrew large amounts of cash from a CTM Wells Fargo Bank ('Wells Fargo') account and a CTM Chase Bank account. Cutting additionally appears to have moved investor money between and among various accounts, including certain of his personal bank accounts." *Id.* at 4.

98.    As part of its investigation, the SEC has issued subpoenas to several financial institutions where Cutting holds accounts. CTM and Cutting have opened four separate matters to prevent these subpoenas from going forward: *Crypto Traders Management, LLC and Shawn Cutting v. United States Securities & Exchange Commission*, Nos. 1:20-mc-00335-BLW (Glacier Bank), 1:20-mc-00336-BLW (Wells Fargo), 1:21-mc-00375-BLW (Washington Federal Bank), and 1:21-mc-00376-BLW (Washington Federal Bank). In each, Cutting avers that the accounts are "personal" and "have never held funds related to [CTM]."

99.    The SEC has filed verified oppositions in each of these matters. The SEC argues that it has a "demonstrable reason to believe that the law enforcement inquiry is legitimate" and "a reasonable belief that the records sought [Cutting's banking records] are relevant to that inquiry." Specifically:

> Here, the SEC has more than a reasonable belief that the subpoenaed bank records are relevant to its investigation. The subpoenaed records may provide key information regarding the involvement of Cutting, Lata, and others in the scheme under investigation. The bank records, for example, may reveal how much money from investors was raised, what ultimately happened to investors' money, what other persons or entities were involved in the apparent scheme, and the extent to which investor money may have been used for purposes other than the specific investment

> purpose for which the funds were raised. The records may also identify
> potential victims of possible SEC violations that are not currently known.
> Lastly, the records may help Staff trace the proceeds of possibly illegal
> transactions for purposes of disgorgement.

*See No.* 1:20-mc-00335-BLW, Dkt. 5 (Dec. 23, 2020) at 9-10 (Glacier Bank); No. 1:20-mc-00336- BLW, Dkt. 4 (Dec. 23, 2020) at 5 (Wells Fargo); No. 1:21-mc-00375-BLW Dkt. 4 (Jan. 28, 2021); No. 1:21-mc-00376-BLW, Dkt. 4. (Jan. 28, 2021).

100.    The Court denied the motions to quash and allowed the SEC to enforce its subpoenas in the Glacier Bank and Wells Fargo matters. No. 1:20-mc-335-BLW, Dkt. 8 (Feb. 11, 2021); No. 1:20-mc-00336-BLW, Dkt. 7 (Feb. 11, 2021). It has not yet ruled in the Washington Federal matters.

101.    The SEC investigation is ongoing.

## VII.    Investments in the Crypto Fund are "Securities" Within the Meaning of the Exchange Act

102.    Investments in the Crypto Fund are "securities" as defined in the Exchange Act, 15 U.S.C. § 78c(a)(10), and the Securities Act, 15 U.S.C. § 77b(a)(1), as investment contracts because:

  a.    Guler invested money and other assets readily convertible into money;

  b.    Defendants' operation of the Crypto Fund incorporated money contributed by other investors and managed by Defendants in a common enterprise to generate returns;

  c.    Guler expected to earn a profit on his investment; and

  d.    The profit to be generated by the Crypto Fund was to be generated solely by the efforts of others, namely, Defendants.

103.    All sales of securities at issue in this case took place within the state of Idaho.

104.    All sales of securities occurred online or through bank wire transfers and

implicated internet and telephonic communications between parties of different states. Thus, all conduct alleged in this Complaint involves interstate commerce.

105.    No registration statement has ever been in effect for the securities.

106.    Guler is entitled to prejudgment interest reflecting interest on comparable investments. The bare minimum interest rate applicable here is the Idaho statutory interest rate, I.C. § 28-22-104, but evidence at trial will establish that an appropriate interest rate is much higher given the possibility of aggressive returns on properly managed altcoin investments and growth in other kinds of investments available to Guler.

## COUNT I
## SECURITIES FRAUD UNDER THE EXCHANGE ACT
### (Cutting, Lata, CTM)

107.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

108.    Cutting for himself and for CTM made numerous assertions as to the value of, and changes in value of, investment accounts as described in the paragraphs above.

109.    Such assertions were false either because the value of underlying altcoin assets in the Crypto Fund were far too low to support Cutting's account valuations or because Cutting was simply stealing funds from investors.

110.    Assertions of value and gain were material to all of Guler's decisions to invest. Had he known that investments were declining in value or that account values were untrue, or that Defendants intended to use Guler's investment for their own personal use, Guler would not have invested.

111.    The materially false statements directly caused Guler to make his investments, and he acted in reliance on these statements by investing with the Crypto Fund.

112.    As the fund manager, Cutting was aware that the statements on value and gain

were false when he made them.

113.    Cutting intended for the representations on value and gain to overstate the Crypto Fund performance to generate additional interest and investment in the Crypto Fund.

114.    Lata and Cutting, acting for themselves and for CTM, both made statements identified in the paragraphs above indicating that investments could be withdrawn and accounts could be closed promptly upon notice to Defendants.

115.    Lata and Cutting knew these representations were false because they did not ever intend to promptly comply with withdrawal notices and/or they knew that the Crypto Fund portfolio could not support withdrawals up to the full stated investor account values.

116.    Lata and Cutting made the representations intending to induce prospective investors to contribute more money.

117.    Guler would not have made any investments if he knew he would be unable to withdraw his money on request.

118.    Guler was unaware that Defendants' misrepresentations were untruthful and could not have been aware of the statements' untruth because Guler had no access to data on the Crypto Fund's portfolio.

119.    Defendants all participated in the sale of Crypto Fund investments, which are securities under the Exchange Act. Cutting coordinated these sales directly for himself and CTM. With regard to Lata, she also accepted investment funds into her personal PayPal account.

120.    Cutting was a control person of CTM under the Exchange Act § 20(a), 15 U.S.C. § 78t(a), as its sole manager and member.

121.    Lata was a control person of CTM under the Exchange Act § 20(a), 15 U.S.C. § 78t(a), in her role as an agent managing the sale of, soliciting sale of, accepting funds for, and

communicating with investors regarding, securities.

122.    Defendants' actions of repeatedly misstating the value, gain, and liquidity of securities amounted to a manipulative or deceptive device or contrivance in connection with the sale of securities under Exchange Act § 10(b). Lata and Cutting aided and abetted each other and CTM under Exchange Act § 20(e), 15 U.S.C. § 78t(e), by knowingly and/or recklessly providing substantial assistance in making false and misleading representations to investors and prospective investors.

123.    Defendants are all jointly and severally liable to Guler for all damages proximately caused by their fraudulent misdeeds in an amount no less than $201,000.00, with interest accruing at the Idaho statutory and/or appropriate market rate.

**COUNT II**
**SECURITIES FRAUD UNDER THE**
**IDAHO UNIFORM SECURITIES ACT**
**(Cutting, Lata, CTM)**

124.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

125.    As stated above, Defendants made false and misleading statements regarding the value, gain, and liquidity of Crypto Fund securities.

126.    Guler, having no access to information regarding the Crypto Fund's assets or positions—or indeed any data on financial performance—could not have known of the untruth of these statements in the exercise of reasonable care.

127.    Guler relied on Defendants' representations in deciding to invest in Defendants' securities.

128.    Cutting directly and indirectly controlled the affairs of CTM as its sole member and manager under I.C. § 30-14-509(g)(1) and (2).

129.    Lata directly and indirectly controlled the affairs of CTM by soliciting purchases, receiving funds, and communicating with investors under I.C. § 30-14-509(g)(1) and (2).

130.    Cutting and Lata were associated with, or employees of, each other and CTM and materially aided in the fraudulent conduct described herein under I.C. § 30-14-509(g)(3). Both knew and had reason to know that representations described herein due to their positions of control and authority.

131.    The securities purchased by Guler are not certificated and so no further action is required to tender the securities back to Defendants.

132.    Guler is entitled to recover consideration paid for the Crypto Fund securities, plus the altcoins, plus costs and reasonable attorney fees under I.C. § 30-14-509(b)(1).

133.    Defendants are all jointly and severally liable to Guler for all damages proximately caused by their misconduct in an amount no less than $201,000.00, with interest accruing at the Idaho statutory and/or appropriate market rate.

## COUNT III
## ACTING AS AN UNREGISTERED BROKER UNDER THE
## IDAHO UNIFORM SECURITIES ACT
### (Cutting, Lata, CTM)

134.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

135.    Cutting, for himself and CTM, was engaged and is engaged in the business of using investor funds to effect transactions in altcoins.

136.    Altcoins bought and sold by Cutting and/or CTM are "securities" under I.C. § 30-14-102(28) as investment contracts for the following reasons:

      a.    The altcoins are purchased with money or assets readily convertible into money, such as Bitcoin or other altcoins;

     b.     Altcoins are typically common enterprises to raise money to fund a business venture;

     c.     Altcoin buyers purchase the assets expecting to derive a profit in increased altcoin value; and

     d.     The increased value is due to the efforts of the altcoin issuers and others.

137.     In addition, Lata, as an agent of Cutting and/or CTM, and Cutting, as an agent of CTM, solicited prospective investors to purchase Crypto Fund securities.

138.     Defendants therefore were and are acting as "broker-dealers" under I.C. § 30- 14- 102(4).

139.     Defendants have never registered as broker-dealers with the Idaho State Department of Finance as required under I.C. § 30-14-401(a).

140.     Cutting and Lata sold Crypto Fund securities to Guler in violation of I.C. § 30-14-401(a).

141.     Cutting and CTM effected securities transactions on behalf of consumers in violation of I.C. § 30-14-401(a).

142.     Pursuant to I.C. § 30-14-509(d), Cutting and CTM are jointly and severally liable to return the consideration paid in an amount no less than $201,000.00, with interest accruing at the Idaho statutory and/or appropriate market rate.

143.     In addition, Cutting and CTM are liable for Guler's costs and attorney fees under I.C. § 30-14-509(b)(1) and -509(d).

### COUNT IV
### IDAHO CONSUMER PROTECTION ACT
### (All Defendants)

144.     Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

145.     Defendants offered their services as fund managers for investors. As described above, Defendants are engaged in a systematic scheme to misrepresent the value, gain, and liquidity of Crypto Fund investments.

146.     Defendants also misrepresented their ability to provide investment services by indicating that they had competent legal counsel, auditors, analysts, fund managers, and IT professionals on staff.

147.     Defendants engaged in conduct constituting unfair and deceptive acts or practices under I.C. § 48-603.

148.     In reliance on Defendants' deceptive acts and practices, Guler invested significant funds, nearly all of which are lost.

149.     Under I.C. § 48-608(1), Defendants are liable for all damages proximately caused by their misconduct, in an amount no less than $201,000, with interest accruing at the Idaho statutory and/or appropriate market rate.

150.     Guler is entitled to declaratory relief against Defendants' further conduct in soliciting investment, offering or selling securities, effecting securities transactions for others, or in holding themselves out as fund managers.

151.     Guler is entitled to costs and attorney fees pursuant to I.C. § 48-608(5).

152.     Defendants engaged in a sustained, repeated, and flagrant scheme to defraud Guler and other investors. In the process, they have stolen hundreds of thousands of dollars from innocent people. They are therefore liable for punitive damages in an amount to be proven at trial, but which is at minimum the greater of $250,000 or triple the actual damages. Guler, therefore, reserves the right to amend this complaint to include a claim for punitive damages pursuant to I.C. § 6-1604.

## COUNT V
## COMMON-LAW FRAUD
### (All Defendants)

153.     Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

154.     Defendants repeatedly represented the value, appreciation, and liquidity of the Crypto Fund, as noted above. Defendants also specifically asserted that:

      a.     Their operations are audited monthly;

      b.     They have competent counsel, certified public accountants, IT professionals, and analysts; and

      c.     They purchase and sell altcoins on legitimate (i.e., registered) securities exchanges.

155.     These representations were all false and Defendants, as the only people working on the project, were aware of that.

156.     Guler did not and could not know that the above representations were false.

157.     Defendants intended for Guler to rely on the statements to obtain additional investment.

158.     If Guler had known that these misrepresentations were false, he would have known that his investment was on its way to becoming worthless, through theft or otherwise, and was not being managed by competent fund managers. Hence, the misrepresentations were material.

159.     Guler had a right to rely on representations by people soliciting his investment and had no reason not to at the time he made his investments.

160.     Guler has lost significant sums of money.

161.     Defendants acted in active concert, aiding, and abetting each other and CTM in

the commission of these torts.

162.    Defendants are jointly and severally liable to Guler for damages proximately caused by the fraud in an amount no less than $201,000.00, with interest accruing at the Idaho statutory and/or appropriate market rate.

## COUNT VI
## BREACH OF ORAL CONTRACT
### (Cutting, Lata, CTM)

163.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

164.    By accepting investments from Guler, Lata and Cutting, acting in their personal capacities and on behalf of CTM, created actual and implied contractual relationships with Guler.

165.    Among the terms governing Guler's investments were that Guler could make withdrawals at any time, could close his account at any time, and could expect accurate information as to his account status and value.

166.    Defendants breached these contract terms by lying about the value of Guler's account and refusing to honor withdrawal requests.

167.    Specifically, and in addition to the foregoing, Defendants have breached the contract terms by failing to return original invested funds and/or altcoins, and/or by failing to pay Guler his active investments.

168.    Defendants have damaged Guler in an amount no less than $201,000, with interest accruing at the Idaho statutory and/or appropriate market rate.

## COUNT VII
## CONSTRUCTIVE TRUST
### (Cutting, Lata, CTM)

169.    Guler repeats and realleges all the preceding paragraphs as if fully set forth

herein.

170.     Defendants have received hundreds of thousands of dollars due to fraud and other unconscionable behavior.

171.     This Court should impose a constructive trust on all of Guler's investment funds and order those assets returned to Guler in an amount no less than $201,000.00, with interest accruing at the Idaho statutory and/or appropriate market rate.

## COUNT VIII CONVERSION
### (All Defendants)

172.     Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

173.     Defendants are exercising dominion and control over Guler's property—altcoins purchased with Guler's money and/or the monetary value of the investment and altcoins—to deprive Guler of his right to control his property.

174.     Defendants have refused to return Guler's property.

175.     Defendants have converted Guler's property to their own use and have spent, hidden, or given away Guler's property.

176.     Defendants have exceeded the scope of their authorized use of Guler's property by using it for personal purposes and/or refusing to return the investments as agreed.

177.     Defendants have dispossessed Guler of his property in bad faith by intentionally orchestrating a scheme to obtain and either steal or squander Guler's property.

178.     Defendants have aided and abetted each other in a chain of conduct to convert Guler's property and are therefore jointly and severally liable for all damages.

179.     In addition to the above, Cutting, as agent for CTM, is personally liable for all damages sustained by Guler for property he received personal possession of.

180.    In addition to the above, Lata, as agent for Cutting and/or CTM, is personally liable for all damages sustained by Guler for Guler's property she received personal possession of.

181.    Defendants are jointly and severally liable to Guler in an amount no less than $201,000, with interest accruing at the Idaho statutory and/or appropriate market rate.

### COUNT IX NEGLIGENCE
### (All Defendants)

182.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

183.    By taking possession of Guler's assets, Defendants assumed a duty to Guler to act with reasonable care in the management and safeguarding of Guler's assets.

184.    Defendants lack experience, training, certification, and intelligence necessary to properly manage an investment fund. They have failed to comply with applicable state and federal regulations applicable to public securities issuers, investment advisors, investment companies, broker-dealers, and other investor fiduciaries or agents of the foregoing. Defendants further failed to act as reasonable persons under like circumstances by properly analyzing investments, hedging risk, diversifying the Crypto Fund portfolio, maintaining internal controls, and/or following appropriate security measures.

185.    As a proximate result of Defendants' negligence, Guler has suffered damages in the loss of his investment of at least $201,000, with interest accruing at the Idaho statutory and/or appropriate market rate.

### COUNT X UNJUST ENRICHMENT
### (All Defendants)

186.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

187.    Defendants held themselves out as professional fund managers.

188.    Defendants received benefits from Guler in the form of money and altcoin.

189.    Defendants appreciated these assets by using the assets to fund their personal expenses, to pad their investment portfolio, and to otherwise use the assets to attempt to generate returns upon which they could charge fees.

190.    Defendants represented that investments were increasing in value and could be withdrawn.

191.    It would be inequitable for Defendants to retain the benefit of Guler's investments.

192.    Guler suffered damages in the loss of his investment of at least $201,000, with interest accruing at the Idaho statutory and/or appropriate market rate.

**COUNT XI**
**BREACH OF FIDUCIARY DUTY**
**(All Defendants)**

193.    Guler repeats and realleges all the preceding paragraphs as if fully set forth herein.

194.    Defendants entered into a fiduciary relationship with Guler because Guler relied on Defendants to prudently invest and safeguard his funds.

195.    Defendants breached their fiduciary duties of loyalty to Guler by misappropriating his investment funds.

196.    Defendants breached their fiduciary duties of care to Guler by squandering his investment funds.

197.    Defendants have caused a total loss of Guler's investments through their mismanagement.

198.    Defendants are liable to Guler in amounts to be proven at trial.

## COUNT XII
## VOIDABLE TRANSFER
### (Idaho Code §55-910 et seq)
### (All Defendants)

199.    Plaintiffs repeat and reallege all of preceding paragraphs as if fully set forth herein.

200.    The Transferor Defendants transferred assets to the Transferee Defendants while Guler was Transferor Defendants' creditors.

201.    The Transferor Defendants transferred such assets with an actual intent to hinder, delay, or defraud creditors, including Guler.

202.    The transfers meet many, if not all, of the non-exclusive factors listed in the Voidable Transfers Act as evincing intent.

      a.    The transfers were made to insiders.

      b.    The Transferor Defendants retained control over the assets after the transfer.

      c.    The transfers were concealed.

      d.    The Transferor Defendants have represented that they are insolvent.

      e.    The transfers occurred shortly after the Transferor Defendants incurred a substantial debt to Guler.

203.    The Transferee Defendants did not receive the transfers in good faith or for reasonably equivalent value from the Transferors Defendants.

204.    The asset transfers described herein are void under Idaho's Voidable Transfers Act and Guler is entitled to redress and all available remedies, including injunctive, declaratory, and monetary remedies, pursuant to § 55-916 of that Act.

## COUNT XIII
## ALTER EGO / CORPORATE VEIL PIERCING
### (All Defendants)

205.     Guler repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.

206.     Throughout the course of the events described above, inclusive of the breaches of applicable federal and state securities laws, fraud, negligence and breach of fiduciary duty, each individual Defendant organized and operated the entity defendants CTM, Ash Development, Golden Cross, CTF, and the Lake View Trust, in a manner so as to make those entities mere instrumentalities or business conduits of each of the individual defendants.

207.     The individual Defendants dominated, influenced, and controlled the entity Defendants to perpetrate fraud, accomplish injustice and/or circumvent the law.

208.     Likewise, the entity Defendants are not really separate entities in that there is such a unity of interest and ownership that the separate personalities of the entities no longer exist and the failure to disregard their separate identifies would result in fraud or injustice. Those entities operate under common ownership and management, have interrelated operations, and upon information and belief, use, share, and/or intermingle funds in various financial accounts.

209.     At all relevant times, there existed and now exists a unity of interest and ownership between all defendants; the individuality and separateness of each defendant have ceased.

210.     As a consequence of the conduct of Cutting, Lata, and CTM, Guler has been injured and is entitled to recover damages from Cutting, Lata, and CTM in an amount to be determined at trial.

211.     For these reasons, the defendants are alter egos of each other and the Court should

pierce the corporate veil to impose any liability to Plaintiff found in the above causes of action to each defendant.

## JURY TRIAL DEMAND

212.    Guler demands a trial by jury on any issue so triable pursuant to Federal Rule of Civil Procedure 38.

## COSTS AND FEES

213.    Due to Defendants' fraudulent misconduct, breach of federal and state statutes, and other wrongdoing described above, Guler separately retained legal counsel to attempt to seek recovery in this litigation.

214.    Guler is entitled to recover attorney fees pursuant to Federal Rule of Civil Procedure 54, Idaho Code §§ 12-120(3), 12-121, 30-14-509(b), and 48-608(5), and other applicable laws.

215.    In the event that Guler takes a default judgment against Defendants, or any of them, the amount of $20,000 shall constitute a reasonable attorney fee.

## PRAYER FOR RELIEF

**Wherefore**, Guler requests judgment as follows:

1.    An award of damages against Defendants jointly and severally in favor of Guler in an amount to be determined at trial, but in no event less than $201,000, with interest accruing at the Idaho statutory and/or appropriate market rate;

2.    An imposition of a constructive trust on all of Plaintiff's investment funds in the amount of at least $201,000;

3.    An order for a full accounting of Guler's investment;

4.    A declaration that each defendant is the alter ego of the other and liable for all

damages and relief awarded to Guler;

5.     An order that Defendants must return to Guler all altcoins purchased with his

investments;

6.     A judgment rendering the asset transfers between the Transferor Defendants and

Transferee Defendants void under the Idaho Voidable Transfers Act, Idaho Code

§§ 55-901 et seq., and for avoidance, attachment, monetary relief, or other relief

redressing Guler's rights as a creditor in accordance with Idaho Code § 55-916;

7.     An award against Defendants jointly and severally for all costs and expenses of

suit;

8.     An award against Defendants jointly and severally for Guler's reasonable attorney

fees, which shall in the event of default judgment be $20,000; and

9.     Such other and further relief as the Court deems just and proper.


Dated March 11, 2021                    DEMPSEY FOSTER PLLC

                                        /s/ Alyson A. Foster
                                        Alyson A. Foster, ISB No. 9719
                                        alyson@dempseyfoster.com
                                        Jennifer Schrack Dempsey, ISB No. 7603
                                        jen@dempseyfoster.com
                                        800 W. Main Street, Suite 1460
                                        Boise, ID 83702
                                        Telephone: (208) 401-9533

                                        *Attorneys for Guler*

**VERIFICATION**

I, Alper Guler, declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that I am the individual Plaintiff named in this lawsuit and have authorized the filing of this Verified Complaint. I have reviewed the allegations made in this Verified Complaint and to those allegations to which I have personal knowledge, believe them to be true.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Alper Guler_

Alper Guler